# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF WASHINGTON
# AT SEATTLE

WANDA E. SMITH-JETER,

    Plaintiff,

v.

ARTSPACE EVERETT LOFTS CONDOMINIUM ASSOCIATION and QUANTUM MANAGEMENT SERVICES,

    Defendants.

Case No. C17-1857-JPD

ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

## I. INTRODUCTION AND SUMMARY CONCLUSION

This matter comes before the Court on the motion for summary judgment filed by defendants, the ArtSpace Everett Lofts Condominium Association (the "Association")[1] and Quantum Management Services, Inc. ("Quantum"). Dkt. 53. Plaintiff Wanda E. Smith-Jeter has filed a response opposing the motion, Dkts. 56, to which the defendants have replied. Dkt. 59. After careful consideration of the parties' submissions, the governing law and the balance of the record, the Court GRANTS defendants' motion for summary judgment, Dkt. 53, and DISMISSES this action with prejudice.

---

[1] The Association is a condominium association made up of a board of representatives from the ArtSpace Everett Lofts, and an adjacent property, the Schack Art Center. Dkt. 55, Ex. 4 (Huang Decl). at 2. The Schack Art Center is a completely separate entity from both defendants ArtSpace Everett Lofts and Quantum Management Services, Inc. Dkt. 61 (Huang Decl.) at ¶ 4. Other than sharing a building, they are not affiliated. *Id*. at ¶ 5.

ORDER - 1

## II. BACKGROUND

### A. Factual Background

Plaintiff has resided with her husband, Jesse James Jeter, in the ArtSpace Everett Lofts ("ArtSpace") since June 2012. Dkt. 32 at 2. She and her husband are both disabled African-Americans. *Id.* ArtSpace is a 40-unit multifamily housing community in Everett, Washington, set aside specifically for working artists. Dkt. 49 (Huang Decl.) at 4. The ArtSpace property is managed by Quantum, which is a Washington company based in Lynnwood. Dkt. 54 (Heimarck Decl.) at ¶ 1; Dkt. 32 at ¶ 4. As ArtSpace receives tax credits under the federal Low-Income Housing Tax Credit program, it is subject to the Fair Housing Act. Dkt. 32 at ¶ 7; *see also* Dkt. 55, Ex. 4 (Huang Decl). at 2.

ArtSpace allows tenants to display their art in the lobby of the building, as well as outside their individual units. *Id*. at ¶ 5. A committee comprised of ArtSpace tenants who volunteer their time, called the Exhibition Committee, have established a procedure for displaying art in the lobby. *Id*. The Exhibition Committee assists residents in displaying their work by scheduling an exhibition and opening the lobby to the public for four to five hours each month during Everett's monthly ArtWalk. *Id*. at ¶ 6. Artists who are interested in displaying their art in the lobby are provided an Exhibition Request Form to fill out, along with documents providing information about the Exhibition Committee FAQs, Artist Bio, Installation, Day of the Art Walk, Hospitality Table, and De-Installation requirements. Dkt. 54, Ex. 1. These documents provide that the Exhibition Committee is not regulated, guided, or under the influence of Quantum or building management, apart from a few rules generated by ArtSpace. Dkt. 54, Ex. 1 at 1. Specifically, the FAQ provides, "We are a committee of volunteers and are not regulated, guided or under the influence of Quantum or building management. We are supported by ArtSpace, however, and these few rules come from ArtSpace…" *Id*. One of these rules is that "all 'mature' or controversial work must be hung in the Community room to limit access to children and/or those who might find the work

objectionable." Dkt. 54, Ex. 1 at 1.

In October 2017, a multi-media art piece was hung on the wall near the lobby entrance to ArtSpace, just a few feet from a bank of mailboxes for the building's residents, including plaintiff's mailbox. The piece was created by Ammah Wilson, an African American tenant of ArtSpace. Dkt. 54 (Heimarck) at ¶ 14. The piece was chosen by the Exhibition Committee, and hung in the lobby as part of a larger Exhibition. *Id*. at ¶ 13. The title of the artwork was "DIE NIGGER DIE." Dkt. 32 at ¶ 16(b). The piece depicts two disembodied African-American heads inside a circle comprised of two chains, which appear to represent two sets of shackles. The back of one of the heads appears to have been bashed in, and both heads appear to be "bleeding." Dkt. 57 at 7-9. The heads and circle of chains are mounted on a background that appears to represent the American flag. Thus, the artwork depicts brutal violence against African Americans, and is suggestive of the institution of human chattel enslavement that used to exist in this country before the end of the American Civil War. *Id.*

Plaintiff asserts that she felt harassed and intimidated by this artwork, and its placement near her mailbox. She believes that defendants are responsible for its placement in this particular location as an act of retaliation against her for having filed a previous lawsuit against the Association for housing discrimination, retaliation, fraud, and an alleged hate crime. *See Smith-Jeter v. ArtSpace Everett Lofts Condominium Association*, Case No. C14-1584-JPD (dismissed with prejudice by Order dated March 9, 2016).[2]

Heidi Heimarck, the onsite Resident Manager of ArtSpace, and her husband Liam Cole, the building and facilities manager, are both employees of Quantum. Dkt. 54 (Heimarck Decl.) at ¶¶ 1, 10. They were both working in this capacity at the time plaintiff filed her previous lawsuit against Artspace. However, no employee or representative of Quantum or ArtSpace, including Ms. Heimarck or Mr. Cole, have ever been a member of the Exhibition Committee at

---

[2] The Ninth Circuit Court of Appeals affirmed this Court's Order dismissing the case with prejudice on April 24, 2017, and the U.S. Supreme Court declined review on March 26, 2018. *See* Dkt. 55, Exs. 2-3.

ORDER - 3

ArtSpace. *Id.* at ¶¶ 9, 10, 11. In addition, no employee or representative of the defendants chose to hang Ms. Wilson's artwork, nor directed anyone to hang it. *Id.* at ¶ 11. It is undisputed that once defendants were made aware of plaintiff's objections to Ms. Wilson's piece, a representative of Quantum contacted Ms. Wilson and had the artwork removed. Dkt. 56 at 14 (email from Cindy Huang, Portfolio Manager at Quantum, to Jesse James Jeter, advising him that she asked the artist to remove the artwork).

B. Procedural Background

Plaintiff, proceeding *pro se*, initiated this action on December 7, 2017. Dkt. 1; Dkt. 1-1. In April 2018, plaintiff filed an amended complaint. Shortly thereafter, the Court conducted a telephonic status conference with the parties, and advised them that the Court would direct the Clerk to identify pro bono counsel to represent the plaintiff during early Alternative Dispute Resolution ("ADR") proceedings. Dkt. 24. Although pro bono counsel helped plaintiff file a Second Amended Complaint and participate in an early mediation, Dkt. 26, the parties' efforts to resolve the matter in June 2018 were unsuccessful. Dkt. 35.

After plaintiff's pro bono counsel withdrew from the case, Dkt. 41, plaintiff filed several "corrections" to the Second Amended Complaint. Dkts. 38, 42. Namely, plaintiff withdrew her husband, Jesse James Jeter, as a plaintiff, and withdrew any claims for incidents that occurred prior to 2017 or were previously adjudicated in the prior lawsuit. Dkt. 38. Plaintiff also withdrew any claims against the defendants for vandalism and malicious harassment. Dkt. 42. Thus, the only remaining claim in this action, in plaintiff's words, is for "retaliation under the Fair Housing Act, for [plaintiff] having filed the previous lawsuit against one of the defendants," by hanging Ms. Wilson's artwork in the lobby of ArtSpace in an effort to intimidate and harass plaintiff. Dkt. 42.[3]

---

[3] Plaintiff makes several allegations that Judy Tuohy, Executive Director of Schack Art Center, posed a threat to her housing. However, the precise nature of plaintiff's arguments about Ms. Tuohy are unclear, as Ms. Tuohy is not an employee, representative, or agent of either defendant in this case. Although plaintiff provides emails showing that Ms. Tuohy courteously inquired if plaintiff and her husband were interested in appearing in a

Defendants filed their Answer to the modified Second Amended Complaint. Dkt. 45. On October 16, 2018, defendants filed the instant motion for summary judgment. Dkt. 53. Plaintiff opposed the motion, Dkt. 56, and defendants replied. Dkts. 59-61.[4]

### III. JURISDICTION

Pursuant to 28 U.S.C. § 636(c), the parties have consented to having this matter heard by the undersigned United States Magistrate Judge. *See* Dkts. 22, 30. The Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1367. Venue is proper under 28 U.S.C. § 1391(b).

### IV. DISCUSSION

A. <u>Summary Judgment Standard</u>

A moving party is entitled to summary judgment when there are no genuine issues of material fact in dispute and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). An issue of fact is "genuine" if it constitutes evidence with which "a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). That genuine issue of fact is "material" if it "might affect the outcome of the suit under the governing law." *Id.*

When applying these standards, the Court must view the evidence and draw reasonable inferences therefrom in the light most favorable to the nonmoving party. *See United States v. Johnson Controls, Inc.*, 457 F.3d 1009, 1013 (9th Cir. 2006). The moving party can carry its initial burden by producing evidence that negates an essential element of the nonmoving party's claim, or by establishing that the nonmoving party does not have enough evidence of an

---

campaign flyer with her - an invitation they declined – Ms. Tuohy has no connection with defendants and her actions cannot be imputed to them.
[4] Plaintiff filed a procedurally improper opposition to defendants' reply, which the Court declines to consider. Dkt. 62.

ORDER - 5

essential element to satisfy its burden of persuasion at trial. *Nissan Fire & Marine Ins. Co. v. Fritz Cos., Inc.*, 210 F.3d 1099, 1102 (9th Cir. 2000).

Once the moving party has met this burden, the nonmoving party then must show that there is a genuine issue for trial. *Anderson*, 477 U.S. at 250. The nonmoving party must do more than simply deny the veracity of everything offered by the moving party or show a mere "metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252. The nonmoving party's failure of proof concerning an essential element of its case necessarily "renders all other facts immaterial," creating no genuine issue of fact and thereby entitling the moving party to summary judgment. *Celotex*, 477 U.S. at 327.

   B. <u>Plaintiff's Fair Housing Act Retaliation Claim</u>

Plaintiff's sole claim in this action is for retaliation in violation of Section 3617 of the Fair Housing Act ("FHA"), 42 U.S.C. § 3617. Plaintiff contends that, because she previously brought an action for discrimination and retaliation against the Association, which was still on appeal in 2017, several employees of the defendants retaliated against her in October 2017 for engaging in this protected activity. She alleges that these employees either placed (or directed Ms. Wilson to place) a multi-media art piece depicting violence against African Americans near plaintiff's mailbox in an intentional effort to threaten or intimidate her.[5] In addition, plaintiff claims that the defendants' response to plaintiff's complaints about the painting "conceded" that by allowing the artwork to be displayed in the lobby, ArtSpace and Quantum had violated the Fair Housing Act.

---

[5] Plaintiff's husband Jesse J. Jeter asserts that the artist who created the painting has been harassing him and "has made unnecessarily adversarial overtures toward me in the presence of my wife on several occasions." Dkt. 57 (Jeter Decl.) at 2. Thus, plaintiff appears to believe that the artist who created the artwork was knowingly assisting defendants in their attempt to harass her.

The FHA protects individuals from certain types of retaliatory conduct by making it "unlawful to coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of" his/her housing rights under the FHA. *See* 42 U.S.C. § 3617. To succeed on a retaliation claim, a plaintiff is required to first establish a prima facie case of retaliation by showing that "(1) he [or she] engaged in a protected activity; (2) the defendant subjected him to an adverse action; and (3) a causal link exists between the protected activity and the adverse action." *Walker v. City of Lakewood*, 272 F.3d 1114 (9th Cir. 2001).

For the first *Walker* element, a "protected activity" must relate to the exercise of an individual's housing rights "granted or protected by section 3603, 3604, 3605, or 3606" of the FHA. 42 U.S.C. § 3617; *Hamilton v. Lincoln Mariners Assoc. Ltd.*, No. 14cv1689-WQH (NLS), 2014 WL 5180885, at *6 (S.D. Cal. Oct. 14, 2014) (holding that plaintiff's unilateral installation of security cameras on the leased property was unrelated to any housing right under the FHA and, thus, did not constitute a protected activity).[6] Here, defendants concede that plaintiff's prior lawsuit against the Association for alleged FHA violations constituted "protected activity" within the meaning of the FHA. Dkt. 53 at 9. However, defendants argue that "this is the only element [of the *Walker* test] Plaintiff can meet." *Id*.

To establish the second *Walker* element, plaintiff must show that the defendants subjected her to an adverse action. Moreover, the "adverse action" must be in the form of coercion, intimidation, threats, or interference.[7] *Walker*, 272 F.3d at 1128-29. Defendants

---

[6] Examples of protected activities include filing a formal HUD complaint, *see, e.g.*, *United States v. Barber*, No. C13-5539, 2014 WL 4988200, at *9 (W.D. Wash. Oct. 7, 2014); requesting a reasonable accommodation for disability, *see, e.g.*, Bezi v. Camacho, No. CV SA11-0677, 2014 WL 2215911, at *8 (C.D. Cal. May 23, 2014); sending a letter to defendant asserting plaintiff's rights under fair housing laws, *see, e.g.*, *Manzo v. Hall Vineland Prop., LLC*, No. C10-05279, 2012 WL 608403, at *3 (N.D. Cal. Feb. 24, 2012); and filing informal complaints to property management regarding race discrimination and disability accommodations, *see, e.g.*, *Sturm v. Davlyn Inv., Inc.*, No. CV 12-07305, 2014 WL 2599903, at *6 (C.D. Cal. Jan. 27, 2014).

[7] The HUD has identified five non-exclusive examples of the type of conduct prohibited under § 3617. 24 C.F.R. § 100.400. Examples include "[t]hreatening, intimidating or interfering with persons in their enjoyment of a dwelling because of the race, color, religion, sex, handicap, familial status, or national origin of such persons, or of visitors or associates of such persons" and "[r]etaliating against any person because that person has made a complaint, testified, assisted, or participated in any manner in a proceeding under the Fair Housing Act. 24 C.F.R. § 100.400(2), (5).

argue that plaintiff has not demonstrated that *defendants* subjected her to an adverse action. The Court agrees.

It is immediately apparent why plaintiff took offense to the multi-media artwork at issue in this case, as it depicts brutal violence against individuals of the same race and color as the plaintiff. Moreover, the title of the piece, "DIE NIGGER DIE," uses a contemptuous and highly offensive term for a dark-skinned person, and sounds very threatening. Thus, the Court is sympathetic to plaintiff's objections to such a piece being displayed in a public area like the lobby of her building, where plaintiff must go to collect her mail. Indeed, displaying this piece in the lobby of the building appears to directly violate ArtSpace's "rules" as articulated to the members of the Exhibition Committee. As noted above, the Exhibition Committee FAQs provides that the committee is "not regulated, guided or under the influence of Quantum or building management. We are supported by ArtSpace, however, and these few rules come from ArtSpace…" *Id*. One of these "rules" is that "all 'mature' or controversial work must be hung in the Community room to limit access to children and/or *those who might find the work objectionable*." Dkt. 54, Ex. 1 at 1 (emphasis added). The artwork at issue is clearly a controversial work that should have been hung, if at all, in the Community room (or similar less-frequented location) rather than the lobby of the building.

Contrary to plaintiff's conclusory allegations, however, there is no evidence that any employees of the defendants, such as Ms. Heimarck, Mr. Cole, or Cindy Huang (the portfolio manager of ArtSpace for Quantum, who responded to plaintiff's complaints), had any involvement in the hanging of this piece in ArtSpace . Rather, it appears that the placement of the piece in the lobby was a decision by the Exhibition Committee, related to a larger Exhibition. *See* Dkt. 54 (Heimarck Decl.) at ¶ 13. The evidence submitted by the defendants shows that the only action, in fact, taken by the defendants in relation to this piece was to ask the artist who created it to remove it from the lobby in response to plaintiff's complaints. *See* Dkt. 54 (Heimarck Decl.) at ¶¶ 9-12. Specifically, when plaintiff's husband complained about

the piece to Ms. Huang, she told him that "in response to your concern over the artwork in the lobby, we reached out to the artist and have requested that the artwork be removed. Quantum and ArtSpace are committed to non-discrimination and consider this piece of artwork to be out of compliance with Federal Fair Housing Act." Dkt. 46, Ex. A. Although plaintiff believes this statement by Ms. Huang was an admission of liability on Quantum's part, it is more appropriately understood as a prompt (and appropriate) acknowledgment by defendant Quantum that such a public display of this piece could, under certain circumstances, violate the FHA as many people could find the piece objectionable or offensive. Plaintiff cannot show that defendants (or their agents) took any adverse action, such as hanging (or encouraging tenants to hang) intimidating or threatening artwork in the lobby.[8]

Finally, even if plaintiff could somehow show that defendants should be held responsible for the conduct of the Exhibition Committee, plaintiff still fails to establish the third *Walker* element, *i.e.*, that there was a causal link between this adverse action and her alleged protected activities. Plaintiff simply states that she "believes" that the alleged adverse action was in retaliation for her prior lawsuit, because her previous case was still on appeal. However, the fact that two events are temporally related does not establish causation. The artwork at issue was hung in the main lobby, where it was accessible to all tenants of the building and near many tenants' mailboxes. Plaintiff has provided no evidence, apart from her own bare allegations, that it was intended to target and harass the plaintiff, specifically. *See* Dkt. 56 at 5. By contrast, defendants have provided evidence that the artwork was displayed by another African American tenant of the building for an art exhibition, as ArtSpace is a unique community designed to provide its artist tenants with opportunities to publicly display their art. *See* Dkt. 54 (Heimarck Decl.) at ¶¶ 3-6.

---

[8] Moreover, ArtSpace's policy provided that potentially objectionable pieces should always be displayed in a less public location, reflecting ArtSpace's attempt to prevent any tenants from feeling harassed or discriminated against. This is further reinforced by the fact that Ms. Huang acknowledged plaintiff's concerns and directed that the painting be removed by the artist upon receiving plaintiff's complaint. Dkt. 56, Ex. A.

Accordingly, plaintiff has failed to establish any genuine issues of material fact to preclude summary judgment on her FHA retaliation claim.  Specifically, although plaintiff's prior lawsuit against the Association would constitute a "protected activity" under the FHA, she has failed to establish that defendants took any "adverse action" against her as a result of that activity.

V. CONCLUSION

For the foregoing reasons, the Court GRANTS defendants' motion for summary judgment, Dkt. 53, and ORDERS that all claims against defendants are DISMISSED with prejudice.  The Clerk of Court is directed to furnish a copy of this Order to the parties.

DATED this 19th day of November, 2018.

*James P. Donohue*
JAMES P. DONOHUE
United States Magistrate Judge